FEE PAID

FILED
CLERK, U.S. DISTRICT COURT
7/27/20
CENTRAL DISTRICT OF CALIFORNIA
BY: CS DEPUTY

1  SLATER LAW GROUP APC
   A Professional Corporation
2  MARK K. SLATER, SBN 129742
     mslater@slaterlawgrp.com
3  JUNYONG HUANG-STOWERS, SBN 307178
     jhuang@slaterlawgrp.com
4  33 New Montgomery Street, Suite 1210
   San Francisco, California 94105
5  Telephone:    (415) 294-7700
   Facsimile:    (415) 294-7763
6
7  Attorneys for Plaintiff
   Classic Distributing and Beverage Group, Inc.
8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION**

| | |
|---|---|
| CLASSIC DISTRIBUTING AND BEVERAGE GROUP, INC., a California corporation;<br><br>Plaintiff,<br><br>v.<br><br>DIAGEO BEER COMPANY USA, a Delaware corporation;<br><br>Defendant. | Case No. CV20-6684-DMG(KSx)<br><br>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL<br><br>**COMPLAINT FOR:**<br><br>**(1) ANTICIPATORY BREACH OF CONTRACT;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; and**<br>**(4) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 25000.9** |

CLASSIC'S COMPLAINT AGAINST DIAGEO

Plaintiff Classic Distributing and Beverage Group, Inc. ("Classic") hereby alleges as follows:

**JURISDICTION AND VENUE**

1. The Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Classic and Defendant Diageo Beer Company USA ("Diageo"), and the damage caused to Classic exceeds $75,000.

2. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Los Angeles County, California. Diageo is also subject to personal jurisdiction in California. Moreover, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**PARTIES**

3. Classic is, and at all relevant times was, a California corporation with its principal place of business in City of Industry, California.

4. On information and belief, Diageo is, and at all relevant times was, a Delaware corporation with its principal places of business in Norwalk, Connecticut and New York City, New York.

**INTRODUCTION**

5. For decades, long-time Southern California beer distributor Classic ably performed its contract with multinational beer and beverage manufacturer Diageo. Their agreement ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Diageo, however, terminated Classic, ignored the Agreement and ignored even the pretense of seeking fair market value. In breach of the Agreement and in violation of California law, Diageo has compelled Classic to relinquish its rights to Diageo's proxy, Harbor Distributing, L.L.C., a subsidiary of Reyes Holdings, L.L.C. ("Reyes"), for millions of dollars

-1-

less than those rights are worth. This action follows.

**FACTUAL ALLEGATIONS**

6. Diageo is a multinational alcoholic beverage company and one of the world's largest producers of spirits and beer. Its brands include Guinness, Johnnie Walker, and Smirnoff (the world's best-selling vodka).

7. Classic is a Southern California-based alcoholic beverage wholesaler. It has been serving Metro Los Angeles and eastern Los Angeles County for over 40 years.

8. On February 1, 2007, Diageo and Classic entered into a Distribution Agreement (the "Agreement") ████████████████████████████████████████████ ████████████████████████████████████. This Agreement is regulated by California law, and was intended to replace prior agreements.

9. For decades, Classic worked diligently to market and distribute Diageo's products pursuant to the Agreement, significantly expanding Diageo's market in Classic's territory.

10. Since the beginning of 2020, the COVID-19 pandemic has upended the nation and economy, and beer distribution was not immune to disruption and interruption, particularly as Southern California was hard hit.

11. Unbeknownst to Classic, Diageo had been in discussions with Reyes about redirecting all of Classic's distribution rights in Diageo products, along with two other distributors', to Reyes.

12. Meanwhile, however, ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ The failure to honor accepted orders of Diageo products has cost Classic at least

---
1 ████████████████████████████████████████████████████████
████████████████████

1  $147,080 in lost gross profit.  This, as discussed in detail below, translates into at least a
2  $1,178,080 loss in the fair market value of Classic's rights.
3      13.    Worse, since the lockdown, Diageo has requested multiple, significant financial
4  concessions from Classic to protect Diageo's brands, including a substantial investment in
5  marketing to promote Diageo's products immediately before the termination.
6      14.    Classic trusted Diageo, and invested heavily to help this partnership weather the
7  pandemic storm.  Diageo did not reciprocate.
8      15.    Soon after the marketing investment and despite breaching its contractual
9  obligations, Diageo sent a Notice of Termination to Classic on June 15, 2020, purporting to
10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11     16.    Diageo, however, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
14 ▇▇▇▇▇▇▇▇



-3-

CLASSIC'S COMPLAINT AGAINST DIAGEO

17.     By statute, the fair market value of a beer wholesaler's distribution rights in California "includes all elements of value, including, but not limited to, goodwill."  Bus. & Prof. Code §§ 25000.2, 25000.9.  It is widely accepted by the California legislature and courts that "fair market value" means the price a willing buyer would pay a willing seller in the open market, when neither is under any compulsion to participate in the transaction.  Code Civ. Proc. § 1263.320(a); Rev. & Tax. Code § 110(a); Bus. & Prof. Code § 22977.2(a)(2)(B); *Gallois v. W. End Chem. Co.*, 185 Cal.App.2d 765, 774-775 (1960).

18.     In the beer wholesaling industry, the fair market value of a beer wholesaler's distribution rights is typically measured by a multiple of the wholesaler's EBITDA[2] with respect to the brands during the twelve months immediately preceding the termination.

19.     Not only did Diageo make no effort to propose a fair market value, but it instead actively sought to fatally undermine the fair market valuation process ███████████████, by forcing Classic to surrender the brand to Reyes at a price far below the fair market value of Classic's rights.

20.     Just two hours after Diageo orally informed Classic of its decision to terminate the Agreement, and before Classic received the formal termination notice, two industry newsletters, Beer Business Daily and Beer Marketer's Insights, reported the termination and Diageo's decision to move Classic's rights to Reyes.  Beer Marketer's Insights even quoted Diageo's President Nuno Teles' comment on the move.  It is apparent that Diageo told the two news outlets of the termination before Diageo informed Classic.

21.     Then, on June 26, 2020, Diageo sent a notification letter to the retailers in Classic's territory, informing them that Reyes would be replacing Classic starting July 18, 2020.

22.     This notification letter was sent before Classic had reached a deal with Reyes, or with any other distributors for its distribution rights, and with the knowledge that Reyes had offered to buy Classic's rights for a fraction of their fair market value.

23.     Against this backdrop and forced "fire sale," Reyes offered to purchase the rights

---

[2] EBITDA means earnings before interest, taxes, depreciation, and amortization.

-4-

1 from Classic at a multiple of ▓▓▓▓ Classic's trailing twelve-month EBITDA in Diageo's beer brands, and of ▓▓▓▓ for progressive adult beverage brands. Not surprisingly, the Reyes offer was a small fraction of the fair market value of Classic's rights, and flouted industry practice.

24. Distribution rights in the beer wholesaling industry have been trading between ten- and fourteen-times multiples of the seller's EBITDA in the brand during the twelve months immediately preceding the sale. These multiples are results of arms-length negotiations among sophisticated parties as well as appraisals by industry experts, and are widely accepted as the standard range for beer wholesale rights. Based on the long history of Diageo as the market leader and the extraordinary growth in Diageo's flavored malt beverage and seltzer business, along with the minimum expenses to the acquiring distributor, Classic's rights to the Diageo brands fall on the high end of the multiple range, with a fair market value of many millions of dollars more than the Reyes offer. Indeed, a different Southern California beer wholesaler had made an offer to purchase Classic's distribution rights that, while made in the context of a hurried and forced sale, more closely reflected the industry standard.

25. On July 2, 2020, Classic agreed to sell its distribution rights for eight times trailing twelve-month gross profit to that wholesaler (the "Deal"). This was the best price that Classic could get given the urgency of the sale and Diageo's calculated moves to sabotage Classic's ability to negotiate fair market value.

26. On the same day, Classic's President, Carlos Sanchez, emailed Mr. Teles about the Deal. Mr. Sanchez explained in the email that the purchasing wholesaler had been a reputable beer wholesaler in Southern California for over 60 years and had a wide and deep portfolio across beers, wine and spirits, and non-alcoholic products. While Diageo was familiar with that wholesaler's business and reputation, Mr. Sanchez stated he would be happy to ask that wholesaler to provide further information to Diageo. Mr. Sanchez asked Diageo to promptly approve the Deal, emphasizing that it was for millions more than Reyes' offer.[3]

---

[3] Pursuant to the Agreement, the sale of Classic's rights must be approved by Diageo.

27. Classic has made Diageo aware that Diageo's behavior was making it impossible for Classic to obtain a fair market value price on multiple occasions, both verbally and by letters dated June 25, 2020, July 13, 2020, and July 17, 2020. But Diageo has made no effort whatsoever to put forward a fair market value offer. It instead insisted that Classic was not entitled to anything except for Reyes' payment in its July 11, 2020 and July 15, 2020 letters to Classic. In these letters, Diageo oddly asserted that the Reyes offer was the fair market value proposal by Diageo, even though Diageo did not make the offer nor would it pay the purchase price. Diageo connived with Reyes to strong-arm Classic into accepting a "fire sale" price for Classic's rights so Diageo could avoid paying fair market value compensation.

28. By limiting the market for Classic's distribution rights to only one buyer, and forcing Classic to sell to that buyer, Diageo deliberately eliminated each component underlying the determination of a fair market value appraisal—a willing seller, an open market, and the absence of compulsion. Diageo has rendered Classic an unwilling seller forced to surrender a valuable asset at a fire-sale price to a single buyer selected by Diageo. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Reyes knew this, deliberately made a low-ball offer to Classic, and Diageo forced Classic to accept it.

29. After much delay, Diageo disapproved the Deal. With the termination date looming, Classic had no choice but to sell its rights to Reyes, at millions below fair market value. To date, Classic has not received any termination payment from Diageo as required under ▓▓▓▓.

## FIRST CLAIM FOR RELIEF

### (Anticipatory Breach of Contract)

30. Classic hereby realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 29, inclusive, of this Complaint, as though fully set forth herein.

31. Classic and Diageo entered into the valid and enforceable Agreement, whereby ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

32. No performance owed to Classic by Diageo was excused under the Agreement.

33. Diageo forced Classic to transfer its rights to Reyes despite knowing Reyes' offer was below fair market value and a different wholesaler had agreed to purchase Classic's rights for millions more.  Diageo also made it impossible for Classic to obtain fair market value for its rights by informing the entire industry, as well as Classic's retailers, of the transfer to Reyes before Classic could start any meaningful negotiations.

34. At the time of Diageo's acts described in paragraphs 30-33 above, Classic had performed the terms of the Agreement and was ready, willing, and able to continue its performance under the Agreement.

35. Diageo's failure and refusal to perform its obligations under the Agreement has damaged Classic in an amount to be determined according to proof at trial.

WHEREFORE, Classic prays for judgment against Diageo as hereinafter set forth in the Prayer.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract)**

36. Classic hereby realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 35, inclusive, of this Complaint, as though fully set forth herein.

37. Classic and Diageo entered into the valid and enforceable Agreement, whereby

38. Classic has performed all duties and obligations required of it under the Agreement, except those duties and obligations which Classic was excused from performing.

39. No performance owed to Classic by Diageo was excused under the Agreement.

40. ██████████████████████████████████████████████████████████

███████████████, which led to at least $147,080 in lost gross profit and $1,178,080 in lost fair market value.

41. ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████

42. As a direct and proximate result of Diageo's breach of the Agreement, as herein alleged, Classic has suffered damage in an amount to be determined according to proof at trial, including, but not limited to, its lost gross profit and fair market value due to Diageo's failure to fill the orders, and its failure to obtain fair market value for its rights.

WHEREFORE, Classic prays for judgment against Diageo as hereinafter set forth in the Prayer.

### THIRD CLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

43. Classic hereby realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 42, inclusive, of this Complaint, as though fully set forth herein.

44. Classic and Diageo entered into the valid and enforceable Agreement, whereby ██████████████████████████████████████████████████████████
████████████████████████████████████████████.

45. The Agreement is governed by California law, which implies the covenant of good faith and fair dealing in every contract.

46. Classic has performed all duties and obligations required of it under the Agreement, except those duties and obligations which Classic was excused from performing.

47. No performance owed to Classic by Diageo was excused under the Agreement.

48. ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

-8-

CLASSIC'S COMPLAINT AGAINST DIAGEO

1 █████████, including by informing the industry of its decision to termination Classic and to
2 transfer Classic's distribution rights to Reyes through industry newsletters before formally
3 terminating Classic; by avoiding discussions with Classic about the fair market value of Classic's
4 rights and allowing Reyes to take over the negotiation; by directing Classic to sell its rights to
5 Reyes, and Reyes alone, despite knowing Reyes' offer was nowhere near fair market value and
6 Classic had secured an offer for millions higher; by informing retailers that Reyes would be taking
7 over Classic's accounts before Classic had the opportunity to engage in fair market value
8 negotiations with Diageo or other distributors; and by eliminating an open market for Classic's
9 distribution rights.

10    49.    As a direct and proximate result of Diageo's breach of the implied covenant of
11 good faith and fair dealing in the Agreement, Classic has suffered damage in an amount to be
12 determined according to proof at trial.

13    WHEREFORE, Classic prays for judgment against Diageo as hereinafter set forth in the
14 Prayer.

### FOURTH CLAIM FOR RELIEF

**(Violation of California Business and Professions Code § 25000.9)**

17    50.    Classic hereby realleges and incorporates by reference each and every allegation
18 contained in paragraphs 1 through 49, inclusive, of this Complaint, as though fully set forth herein.

19    51.    Classic and Diageo entered into the valid Agreement, establishing a brewer-
20 wholesaler relationship regulated by California law.

21    52.    When Classic informed Diageo of the Deal, Diageo conceded that it would be
22 reasonable for Classic to sell to the highest bidder.

23    53.    However, Diageo still rejected the Deal, forcing Classic to sell to Reyes.
24    54.    Diageo's denial was unreasonable because:
25        a.    Diageo knows that Classic only has until July 17, 2020 to seek a buyer for its
26              rights;

      b.   Diageo knows that the wholesaler is a reputable beer wholesaler in Southern California and has been in the business for over 60 years;

      c.   The wholesaler has a wide and deep portfolio across beers and craft beers, wines and spirits, and non-alcoholic products;

      d.   The wholesaler has the funds, facilities, delivery fleet, and human resources to distribute Diageo's products;

      e.   The approval of the Deal would not materially alter the territories for Diageo products; and

      f.   The approval of the Deal would not materially diminish Diageo's performance or competitiveness in the territory.

55.   Because Diageo has unreasonably denied approval of the Deal, Classic was forced to surrender its distribution rights to Reyes at a price significantly below fair market value. But Diageo refused to compensate Classic for the difference between the Reyes offer and the fair market value of Classic's rights.

56.   As a direct and proximate result of Diageo's unreasonable disapproval of the Deal and refusal to compensate Classic for the fair market value of its rights, Classis has been damaged within the meaning of California Business and Professions Code section 25000.9.

57.   Classic is entitled to costs of suit and compensatory damage reflecting the fair market value of its rights under California Business and Professions Code section 25000.9.

WHEREFORE, Classic prays for judgment against Diageo as hereinafter set forth in the Prayer.

## PRAYER

1. That Classic be awarded damages in an amount to be determined according to proof at trial;
2. For pre-judgment and post-judgment interest at the maximum rate allowed by law;
3. For attorneys' fees and costs of suit incurred herein;
4. For such other and further relief as the Court may deem proper.

-10-

| | |
|---|---|
| 1  Dated: July 24, 2020 | SLATER LAW GROUP APC |
| 2 | By: _____ |
| 3 | Mark K. Slater |
| 4 | Junyong Huang-Stowers |
| 5 | Attorneys for Plaintiff Classic Distributing and Beverage Group, Inc. |